UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LISA DEEL,

             Plaintiff,                    Civil Action No. 11-12751

      v.                         District Judge Sean F. Cox
                                   Magistrate Judge Laurie J. Michelson

UNITED OF OMAHA LIFE
INSURANCE COMPANY,

             Defendant.

_____/

### REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S MOTION TO REVERSE ADMINISTRATOR'S DECISION [10] AND TO GRANT DEFENDANT'S MOTION TO AFFIRM ADMINISTRATOR'S DECISION [7]

       Plaintiff Lisa Deel brings this suit pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* She asserts that Defendant United of Omaha Life Insurance Company ("United of Omaha") improperly terminated her short-term disability benefits. Presently before the Court for Report and Recommendation (Dkt. 12) are Plaintiff's Motion to Reverse Defendant's ERISA Determination and Grant Short-Term Disability Benefits (Dkt. 10; *see also* Dkt. 11)[1] and Defendant's Motion to Affirm the Administrator's Decision (Dkt. 7; *see also* Dkt. 15). Upon a careful review of the briefs and the Administrative Record, the Court concludes that oral argument will not aid in the resolution of the motions before the Court. *See* E.D. Mich. LR 7.1(f)(2). For the following reasons, this Court RECOMMENDS that Plaintiff's Motion to Reverse be DENIED and that Defendant's Motion to Affirm be GRANTED.

---

      [1]Plaintiff filed two briefs that are identical save for the table of contents. (*Compare* Dkt. 10 *with* Dkt. 11.) The Court terminated the later-filed brief as duplicative and Plaintiff has not objected. The Court therefore will reference the first-filed brief (Dkt. 10) throughout this Report.

## I. RECOMMENDED FINDINGS OF FACT[2]

Effective June 1, 2006, Defendant United of Omaha issued Group Policy No. GUG-287F ("Policy") to Greektown Casino – Plaintiff's former employer. (Dkt. 6, Administrative Record ("AR") at 1.) Under the Policy, Defendant agreed to pay "Insured Persons" "the benefits to which they are entitled, subject to the terms, conditions and limitations of [the] Policy." (AR at 1.) The Policy provides the following definition of disability:

> Disability and Disabled means that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which You are:
>
> (a) prevented from performing at least one of the Material Duties of Your Regular Job on a part-time or full-time basis; and
>
> (b) unable to generate Current Earnings which exceed 80% of Your Weekly Earnings due to that same Injury or Sickness.
>
> Disability is determined relative to Your ability or inability to work. It is not determined by the availability of a suitable position with Your employer.

(AR at 25.) As relevant to the standard of review to be applied in this case, the Policy incorporates a Certificate of Insurance which in turn provides, "Benefits will be paid after We [United of Omaha] receive acceptable proof of loss." (AR at 1, 16.) The parties do not dispute that the Policy applied to Plaintiff's claim for short-term disability or that it is an ERISA governed plan. (*See also* AR at 22.)

---

[2]In ERISA cases challenging a plan administrator's denial of benefits, the Court does not apply summary judgment standards. *See Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 618-19 (6th Cir. 1998) (Gilman, J., concurring and providing opinion of the Court regarding the appropriate standard); *McCandless v. Standard Ins. Co.*, 765 F. Supp. 2d 943, 951 n.5 (E.D. Mich. 2011). Therefore, this Court will instead recommend findings of fact and conclusions of law to the District Judge. *See Eriksen v. Metro. Life Ins. Co.*, 39 F. Supp. 2d 864, 865 (E.D. Mich. 1999).

Plaintiff formerly worked as an auditor for Greektown Casino.  The job demands were in the "medium" exertional range; they required lifting up to 50 pounds, frequently carrying 25 pounds, and standing or walking for up to six hours in an eight hour workday.  (AR at 188, 423.)  On December 29, 2009, when Plaintiff was 44 years old, she "woke up from a nap" and felt "very tired."  (AR at 424.)  She went to the hospital for left-side weakness and remained hospitalized until January 5, 2010.  (AR at 362.)  Plaintiff refused to undergo an MRI but "repeated head CT[] [scans] were negative for stroke" and a transthoracic echocardiogram[3] and a bilateral carotid Doppler (ultrasound) were also negative.  (*Id.*)  Plaintiff's hypercoagulable workup was also negative.  (*Id.*)[4]  Following her hospitalization, Plaintiff entered rehabilitation.  (*Id.*)

On January 8, 2010, Dr. Greg Guyon completed an "Attending Physician Statement."  (AR at 425.)  He diagnosed Plaintiff with a cerebrovascular accident and left hemiparesis.  (*Id.*)  Dr. Guyon provided that Plaintiff could lift no weight and could only stand for 15-20 minutes at a time.  (*Id.*)  He further stated that Plaintiff had been unable to work from December 29, 2009 to "present."

---

[3]"During a transthoracic echocardiogram (TTE), a technician obtains views of the heart by moving a small instrument called a transducer to different locations on the chest or abdominal wall. A transducer, which resembles a microphone, sends sound waves into the chest and picks up echos that reflect off different parts of the heart."  Cleveland Clinic, *Transthoracic Echocardiogram (TTE)* (reviewed May 2011) *available at* http://my.clevelandclinic.org/services/echocardiogram/hic_transthoracic_echocardiogram_tte.aspx.

[4]"Hypercoagulable states can be defined as a group of inherited or acquired conditions associated with a predisposition to venous thrombosis (including upper and lower extremity deep venous thrombosis with or without pulmonary embolism, cerebral venous thrombosis, and intra-abdominal venous thrombosis), arterial thrombosis (including myocardial infarction, stroke, acute limb ischemia, and splanchnic ischemia), or both."  Steven Deitcher, Cleveland Clinic, *Disease Management Project: Hematology-oncology: Hypercoagulable States* (Aug. 1, 2010) *a  v  a  i  l  a  b  l  e  a  t* http://www.clevelandclinicmeded.com/medicalpubs/diseasemanagement/hematology-oncology/hypercoagulable-states/

(*Id.*)

On January 14, 2010, Plaintiff saw Dr. Ashwin Raval, her primary care physician. (AR at 399.) He noted that Plaintiff "had a stroke on December 29, 2009" and that she "needs forms filled out." (*Id.*) Dr. Raval noted that Plaintiff's past medical history included hypertension and anxiety. (*Id.*) He ordered an MRI of Plaintiff's brain and magnetic resonance angiography ("MRA") of her head and neck. (AR at 400.)

On or around January 15, 2010, Plaintiff filed for short-term disability. (AR at 423-25.) She described the "nature of her illness" as a "stroke" and referenced the December 29, 2009 incident. (AR at 424.) Her application included Dr. Guyon's January 8, 2010 "Attending Physician Statement." (AR at 425.) In a January 19, 2010 letter to Plaintiff, United of Omaha acknowledged receipt of her short-term disability claim. (AR at 415.) Defendant's letter stated, "Based on the information we currently have, the recovery period for your condition would not be expected to extend beyond March 20, 2010. Your benefits are approved to that date. . . . If you believe your disability extends beyond March 20, 2010, you must have your treating medical professional submit medical records for our review." (*Id.*)

On January 21, 2010, Plaintiff was again hospitalized with left-side weakness. (AR at 362.) As with her prior hospitalization, Plaintiff refused an MRI but a CT scan was negative. (*Id.*) While hospitalized, "Psychiatry was consulted and [they] suspected that she had anxiety and severe depression with possible conversion disorder." (*Id.*) "Conversion disorder is a condition in which a person has blindness, paralysis, or other nervous system (neurologic) symptoms that cannot be explained by medical evaluation." A.D.A.M. Medical Encyclopedia, *Hysterical neurosis* (last

reviewed Nov. 23, 2010) *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001950/.[5]

In February 2010, Plaintiff underwent a number of diagnostic tests including those ordered by Dr. Raval the month before.  An electroencephalography ("EEG") returned normal.  (AR at 223.)  An MRI of Plaintiff's brain was also negative.  (AR 240.)  And an MRA of Plaintiff's intracranial vessels was "essentially negative."  (AR at 241.)  An MRA of Plaintiff's cervical vessels, however, revealed a "[q]uestionable long segment smooth narrowing of the left internal carotid artery."  (AR at 241.)  The radiologist noted, "Please correlate clinically for fibromuscular dysplasia.  Conventional angiogram may also be useful for further evaluation as clinically indicated."  (*Id.*)

---

[5]The A.D.A.M. Medical Encyclopedia further provides:
> Conversion disorder symptoms may occur because of a psychological conflict.
>
> Symptoms usually begin suddenly after a stressful experience.  People are more at risk for a conversion disorder if they also have a medical illness, dissociative disorder, or a personality disorder.
>
> It is important to understand that patients are not making up their symptoms (malingering).   Some doctors falsely believe that conversion disorder is not a real condition, and may tell patients the problem is all in their head.  However, these conditions are real.  They cause distress and cannot be turned on and off at will.
>
> The physical symptoms are thought to be an attempt to resolve the conflict the person feels inside.  For example, a woman who believes it is not acceptable to have violent feelings may suddenly feel numbness in her arms after becoming so angry that she wanted to hit someone.  Instead of allowing herself to have violent thoughts about hitting someone, she may experience the physical symptom of numbness in her arms. . . .
>
> Talk therapy (psychotherapy) and stress management training may help reduce symptoms.

A.D.A.M. Medical Encyclopedia, *Hysterical neurosis* (last reviewed Nov. 23, 2010) *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001950/

On March 22, 2010, apparently for Family and Medical Leave Act purposes, Dr. Raval completed a "Certification of Health Care Provider" form.  (AR at 403-05.)  There, Dr. Raval noted, "[r]ecent CFA [and] hypertension[;] seizure disorder."  (AR at 403.)  He indicated that Plaintiff lacked the capacity to work "until released by her neurologist – approx[imate] date [June 6, 2010]." (*Id.*; *see also* AR at 404.)  In terms of further treatment, Dr. Raval provided "follow-up with neurologist for further care."  (AR at 404.)

On May 4, 2010, Dr. Raval completed a "Physical Capacities Checklist."  (AR at 378.)  He provided that Plaintiff could sit for 4 hours during the workday and stand and walk for one hour each.  (*Id.*)  According to Dr. Raval, Plaintiff could lift 10 pounds occasionally but never anything heavier, and she could never carry, push, or pull any weight.  (*Id.*)  He further provided that Plaintiff "has seizures which occur randomly and impair her from operating any type of machinery or doing any strenuous activity.  When a seizure occurs, she freezes in place and the duration is usually 5 to 15 minutes, and then [that is] followed by dizziness, headaches, and numbness."  (AR at 379.)  Dr. Raval concluded, "With [a] history of stroke and seizures[,] in my opinion Deel Lisa is not fit to return to her job for [an] indefinite period."  (*Id.*)

In a letter dated May 7, 2010, Defendant informed Plaintiff that they had "received additional information explaining the medical need to extend your disability benefits."   (AR at 368.) Accordingly, United of Omaha approved Plaintiff's short-term disability benefits through an upcoming, May 28, 2010 neurologist appointment.  (*Id.*)

On May 18, 2010, Plaintiff was evaluated by a psychologist, Dr. Hugh Bray, in connection with her application for Social Security disability benefits.  Plaintiff told Dr. Bray, "I feel down. I don't go anywhere.  I don't do anything.  I cry easily."  (AR at 173-74.)  Plaintiff also reported a

6

seizure lasting 5-10 minutes while in the waiting area and Plaintiff's husband reported that she had seizures two times a day since her December 29, 2009 incident. (AR at 174.) Dr. Bray noted that Plaintiff's "motor activity" was "slowed," her self esteem "poor," and her "emotional reaction" included suspicion, anxiety, and crying. (AR at 175-76.) Plaintiff's answers to the standard mental-status questions were mixed. She could spell "world" backward, understood the don't-cry-over-spilled-milk idiom, explained a difference and a similarity between a piano and a drum, and could name the current president. (AR at 176-77.) But when asked to perform serial sevens (i.e., repeatedly subtracting seven from 100) Plaintiff stated that her "mind [was] blank." (AR at 177.) And Plaintiff took five to fifteen seconds to perform basic arithmetic (e.g., 5+3), she did not know how a bush and tree were different. (AR at 176-77.) Dr. Bray diagnosed Plaintiff with cognitive disorder, not otherwise specified ("NOS"), depressive disorder, NOS, and generalized anxiety disorder. (AR at 177.) Dr. Bray concluded that Plaintiff's mental ability to understand, remember, and carry out tasks was "moderately limited"; in particular, Plaintiff would likely have significant difficulty in performing multiple-step tasks. (*Id.*) He also concluded that Plaintiff's mental ability to withstand stress and pressure associated with day-to-day work activities was "severely impaired." (AR at 178.) He assigned her a Global Assessment Function score of 40 and noted that her prognosis was "poor." (*Id.*)

On May 20, 2010, Plaintiff saw Dr. Hebah Hefzy, a Neurologist at Henry Ford. (*See* AR at 362, 365.) Plaintiff reported staring spells two or three times a day and her husband said that she was unresponsive and stared straight ahead for 10 to 15 minutes during her spells. (AR at 362.) Dr. Hefzy remarked that the February 2010 EEG, MRI, and MRAs were normal but also noted that "she did not have an event during the EEG." (*Id.*) Dr. Hefzy also stated that Plaintiff had lost her

medical insurance and had stopped taking her medication for hypertension, high cholesterol, and depression.  (*Id.*)  Dr. Hefzy performed a mental-status exam and found that Plaintiff was alert and oriented, her attention and concentration were "good," her speech was fluent, and her recent and remote memory were "intact."  (*Id.*)  Dr. Hefzy also did a cranial-nerve exam which, apparently, was normal.  (*See id.*)  Dr. Hefzy's impression was "[p]ossible seizures," "hypertension," "hyperlipidemia," and a "possible [transient ischemic attack] in January [2010]."  (*Id.*)  Dr. Hefzy prescribed medication for Plaintiff's seizures until "she has insurance or can afford a video EEG" and advised Plaintiff "not to drive until she is event free for at least 6 months."  (AR at 364.)

On May 28, 2010, Dr. Brian Silver, a Neurologist, completed a "Certification of Health Care Provider" in connection with the Family and Medical Leave Act.  The form indicates that Dr. Silver had seen Plaintiff once before, on May 20, 2010.  (AR at 349.)  He provided that Plaintiff was unable to perform "cashier work" and noted symptoms of "episodic spells of interrupted consciousness several times daily."  (AR at 349.)  Dr. Silver indicated that Plaintiff had a period of incapacity of January 29, 2009 (he probably intended to write "December 29, 2009") to September 29, 2010.  (AR at 350.)

On June 7, 2010, Dr. Silver completed an "Attending Physician Statement" for Plaintiff's short-term disability claim.  (AR at 354.)  His diagnosis was "loss of consciousness, possible seizures" and he listed "symptoms" of "staring spells."  (*Id.*)  He left the portion of the form pertaining to physical functional limitations blank, however.  (*Id.*)  He provided that Plaintiff's mental abilities were "good" except that her emotional liability and ability to deal with work stress were only "fair."  (*Id.*)[6]  Dr. Silver remarked, "[u]nable to monitor concentration due to frequent

---

[6]The form refers to emotional "liability" although it may have intended "lability."

8

attacks." (*Id.*)  He provided that Plaintiff was unable to work from January 30, 2010 to August 17, 2010 and "then will re-assess." (*Id.*)

In a letter dated June 16, 2010, United of Omaha informed Plaintiff that "at the time being your benefits have been stopped effective May 28, 2010." (AR at 339.)  Defendant said that the reason for the termination was "lack of supportive medical documentation." (*Id.*)  The letter also noted, "[w]e are pending [waiting for?] some additional medical information before we can consider additional disability benefits." (*Id.*)

On or around July 14, 2010, Defendant sent Plaintiff another letter. (AR at 327.)  It provides, in relevant part,

> Based on our review, we have determined that we are unable to approve additional benefits and your claim has been denied for benefits May 29, 2010 forward. . . .
>
> The information we used to make our determination includes medical records received from Dr. Raval, Dr. Silver and your policy provision.
>
> Per the records received, dated May 20, 2010, you were doing well. Since discharge from the hospital, you had not had any stroke symptoms and all diagnostic testing had been normal or negative. Your neurologic exam was normal.  You reported episodes of "staring spells" however it is not noted that you sought care during these episodes.  They were not witnessed by anyone other than your spouse. Your EEG on February 11, 2010 was normal.  You were prescribed generic medication and advised to be seen about your blood pressure which was done at the Chass Clinic in June.  The next follow up with your neurologist is August 17, 2010 indicating a non urgent status.
>
> In summary, the medical records received do not support disability beyond the already approved date of May 28, 2010.

(AR at 327.)

On September 27, 2010, Plaintiff returned to Henry Ford and saw Dr. Denise Leung,

9

apparently a Neurologist.  (AR at 298.)  Plaintiff reported that she may have more than one staring

spell in a day but then not have any for days.  (*Id.*)  Plaintiff explained that she experienced

headaches after her episodes.  (*Id.*)  Plaintiff's husband stated that her staring spells may happen in

public, for example, at the grocery store.  (*Id.*)  Plaintiff also reported stuttering speech since her

stroke and that she never stuttered before the incident.  (*Id.*)  She told Dr. Leung that she was losing

her house because of financial issues and Dr. Leung noted, "she is in the office today in part because

she needs a letter to be able to return to work because she cannot afford to lose her job."  (AR at

298.)  Plaintiff's mental status exam appears to have been normal with exception that "[s]he

seem[ed] to stutter more when she seem[ed] anxious."  (AR at 299.)  Plaintiff's cranial nerve exam

was normal except Dr. Leung found that she had "[d]ecreased sensation to pinprick throughout [her]

left side[;] weakness."  (AR at 299.)  Dr. Leung concluded,

> 44-year-old female with staring spells that could be conversion
> reaction and left-sided numbness that has been determined to not be
> a stroke because of a negative MRI and the symptoms are still
> present, so a possible conversion disorder.  We will send the patient
> for a prolonged video EEG with induction.  We have also
> recommended that the patient see Andrea Thomas who can work with
> any psychological issues. . . .  The patient should continue to not
> drive as she is still having these staring spells and Michigan law
> requires no driving for 6 months if there are any lapses in
> consciousness.  A note to return to work will be provided to the
> patient at this time as her job does not involve anything dangerous
> and the patient does not want to lose her job as they have many
> financial stressors at this time.

(AR at 300.)

On or around October 1, 2010, Plaintiff appealed United of Omaha's decision to discontinue

short-term disability benefits.  (AR at 324.)  On October 13, 2010, Defendant acknowledged

Plaintiff's appeal and informed Plaintiff that her claim was under review.  (AR at 316.)

On October 18, 2010, Plaintiff sent Defendant a letter from Dr. Raval indicating that Plaintiff was unable to work until she was "released by a neurologist." (AR at 306-07.) Dr. Raval remarked, "[history of] stroke [and] seizure." (*Id.*)

On or around November 29, 2010, Plaintiff sent Defendant a November 3, 2010 medical report from Dr. Ram Garg. Dr. Garg noted that Plaintiff "[w]ent to work and was fired. [She] [u]sed to work as a[n] auditor at [a] casino." (AR at 278.) Plaintiff reported a number of ailments: blurred vision, panicky feeling, anxiety, depression, and difficulty concentrating and speaking. (AR at 278.) She also told Dr. Garg that "yesterday . . . [her] daughter ran to her dad and told him mom is frozen." (*Id.*) Dr. Garg performed a mental status exam. Plaintiff was alert and oriented, and she had a normal mood and affect, intact immediate, recent, and remote memory, and her speech was of normal quality. (AR at 280.) Plaintiff could perform serial sevens and had a normal attention span and concentration. (*Id.*) Dr. Garg also performed a cranial-nerve exam which appears to have been normal. (*Id.*) He noted, "sensation, overall: intact to touch, pin, vibration, proprioception, intact to light touch, intact to pin prick." (*Id.*) His diagnoses were depressive disorder, not elsewhere classified, cerebral vascular accident, and hypertension. (*Id.*)

On January 11, 2011, Dr. Bruce LeForce, a Neurologist, performed a review of Plaintiff's medical file on behalf of United of Omaha. (AR at 457-60.) Dr. LeForce's assessment was:

> This is a 44 year old woman who has presented with episodes of left sided weakness. No consistent abnormalities are noted on neurologic examination. The claimant's MRI and CT of the brain are normal. The claimant's MRA of the brain and neck are normal. The claimant's echocardiogram is normal. The claimant is thought to have a conversion disorder.
>
> The claimant complains of seizures although the claimant's EEG is normal. There was no indication the claimant's driving was ever restricted.

11

> There are no objective findings to support-impairment. No
> restrictions or limitations are supported by the information provided
> for any timeframe. The claimant is capable of full time work.

(AR at 459-60.)  Defendant sent Dr. LeForce's assessment to Dr. Garg for his review.  Dr. Garg did

not respond.  (AR at 191.)

On February 3, 2011, Defendant sent a detailed letter to Plaintiff summarizing the medical

evidence and explaining that her appeal had been denied.  (AR at 188-92.)  Regarding Dr. Garg's

recent evaluation and Plaintiff's complaints of staring spells, United of Omaha reasoned:

> A review of the records indicates that Ms. Deel is apparently
> experiencing "episodic spells of interrupted consciousness several
> times daily."  There is no documentation indicating that these
> episodes are witnessed by anyone.  There is no evidence that Ms.
> Deel (or a family member) has sought out urgent or emergent care
> during one of these episodes.  Dr. Hefzy, was unable to determine a
> diagnosis and her only restrictions from him were no driving until
> event free for at least 6 months.  There is no evidence of neurological
> impairment.
>
> There is very limited psychiatric information in the file.  There was
> no treatment with a psychiatrist, psychologist, or therapist.  File
> information does not support that Ms. Deel was suffering from a
> psychiatric impairment that would prevent her from working. . . .
>
> Dr. LeForce found no objective evidence of impairment.  Dr. LeForce
> found no restrictions or limitations are supported by the records in
> file.  Dr. LeForce felt that Ms. Deel is capable of full time work. . .
> .

(AR at 190-91.)  The letter also informed Plaintiff that United of Omaha's review of Plaintiff's claim

was complete:

> Our evaluation of this appeal finds no evidence of restrictions or
> limitations that would prevent Lisa Deel from performing her
> medium strength demand job as an auditor. . . .
>
> At this time, all administrative rights to appeal have been exhausted.
> United of Omaha Life Insurance Company will conduct no further

review of this claim and the claim will be closed.

(AR at 191.)

On February 16, 2011, Plaintiff responded to United of Omaha's denial by requesting a copy of Dr. LeForce's report.  (AR at 183.)  Upon obtaining and reviewing the report, Plaintiff sent Defendant a letter on March 14, 2011 stating: "following [a] review of [Dr. LeForce's report,] there was additional medical evidence to be submitted that should have been reviewed by Dr. LeForce." (AR at 172.)  Plaintiff enclosed Dr. Bray's May 2010 psychological exam.  (*Id.*)

In response, Defendant asked Dr. LeForce to consider Dr. Bray's psychological assessment. (*See* AR at 468.)  Dr. LeForce concluded that Dr. Bray's assessment did not alter his prior conclusion that Plaintiff could work.  (AR at 469.)  He explained,

> The claimant was previously noted to have a conversion disorder.
> This is not addressed in [Dr. Bray's] report.
>
> The evaluation documented does not document any screening for effort on the part of the examinee.  The claimant has undergone an extensive evaluation for objective changes to explain her ongoing symptoms and the evaluation has been normal.
>
> This psychological interview does not change my previous conclusions, which were based on the objective findings on imaging studies, neurologic examination, and other testing.

(AR at 469.)

In a letter dated April 18, 2011, Defendant again informed Plaintiff that her claim for continuation of benefits had been denied.  (AR at 158.)  The letter stated that United of Omaha had completed a "second courtesy review" of her appeal and that Dr. LeForce's conclusions had not changed in view of Dr. Bray's evaluation.  (*Id.*)  The letter again told Plaintiff that she had "exhausted all administrative rights to appeal" and that "United of Omaha Life Insurance Company

will conduct no further review of this claim and the claim will be closed." (AR at 160.)

On or around April 25, 2011, Plaintiff requested Dr. LeForce's report on Dr. Bray's evaluation and sent Defendant additional medical records from Dr. Garg. (AR at 142.) On or around May 5, 2011, Defendant responded by sending Plaintiff a copy of Dr. LeForce's second report. (AR at 132.) Defendant's letter also informed Plaintiff that the additional records from Dr. Garg sent on April 25, 2011 would not be considered: "Please be advised that we did conduct a second courtesy review of Ms. Deel's disability claim after receiving your March 14, 2011 letter and the May 18, 2010 report from Dr. Bray. However, Ms. Deel has exhausted all administrative rights to appeal and no further review of her claim will be done." (AR at 132.)

On June 3, 2011, Plaintiff sent Defendant a letter that included a copy of the Social Security Administration's favorable determination of Plaintiff's Social Security disability benefits claim. (AR at 122.) Defendant asserts that it never responded to this letter. (Dkt. 7, Def.'s Mot. to Affirm at 8.)

On June 8, 2011, Plaintiff filed suit against United of Omaha in Wayne County Circuit Court. (Dkt. 1 at ECF Pg ID 4.) The case was removed to this Court on June 24, 2011. (Dkt. 1 at 2.)

## II. RECOMMENDED CONCLUSIONS OF LAW

### A. Standard of Review

Section 502(a)(1)(B) of ERISA authorizes an individual to bring an action "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). With narrow exceptions not applicable here, this Court considers only the evidence before the plan administrator at the time the employee's disability eligibility was determined. *See Smith v.*

14

*Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997); *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609,

615, 619 (6th Cir. 1998) (finding that the Court may consider non-record evidence offered in support

of a procedural challenge to the plan administrator's decision).

The standard of review in this case – *de novo* or arbitrary and capricious – turns on whether

the Policy grants United of Omaha "discretionary authority to determine eligibility for benefits or

to construe the terms of the plan." *See Shelby County Health Care Corp. v. S. Council of Indus.*

*Workers Health & Welfare Trust Fund*, 203 F.3d 926, 933 (6th Cir. 2000) (quoting *Firestone Tire*

*& Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). A plan may provide its administrator with

discretionary authority without using "any specific terminology or 'magic words,' (such as

'construe,' 'interpret,' 'deference,' or 'discretion')," but "the plan must still contain 'a clear grant

of discretion.'" *Bragg v. ABN AMRO North Am., Inc.*, 579 F. Supp. 2d 875, 889 (E.D. Mich. 2008)

(quoting *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998) (en banc)). The Policy in

this case provides: "Benefits will be paid after We [United of Omaha] receive acceptable proof of

loss." (AR at 1, 16.) The parties do not dispute that this language gave United of Omaha discretion

to determine benefits eligibility, and the case law supports this conclusion. *Id.* ("[A] clear grant of

discretion may be found where the plan provides that the insurer or plan administrator has the ability

to require the claimant to furnish all required proofs, 'written proof' or 'satisfactory proof' of a

disability before continuing benefits."); *see also, Patterson v. Caterpillar, Inc.*, 70 F.3d 503, 505

(7th Cir. 1995) (finding grant of discretionary authority in plan language stating that "benefits will

be payable only upon receipt by the Insurance Carrier or Company of . . . due proof  . . . of such

disability"). Accordingly, the arbitrary and capricious standard applies.

"The arbitrary or capricious standard [of review] is the least demanding form of judicial

review of administrative action.  When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Kentucky Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (internal quotation marks and citations omitted).  Further, Plaintiff has the burden of demonstrating that United of Omaha acted arbitrarily or with caprice.  *See Senzarin v. Abbott Severance Pay Plan for Employees of KOS Pharmaceuticals*, 361 F. App'x 636 (6th Cir. 2010) (citing *Rochow v. Life Ins. Co. of N. Am.*, 482 F.3d 860, 865 (6th Cir. 2007)); *Greening v. Kemper Nat. Services, Inc.*, No. 02-74411, 2005 WL 1593439, at *2 (E.D. Mich. July 6, 2005) ("In order to prevail, Plaintiff has the high burden of proving that [Defendant Kemper National Service's] denial of her [long-term disability] benefits was arbitrary and capricious.").

Yet, arbitrary and capricious review "is not . . . without some teeth."  *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006) (internal quotation marks and citation omitted).  Indeed, a district court reviewing a plan administrator's determination under the arbitrary-and-capricious standard does not sit merely to "rubber stamp the administrator's decision." *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004); *see also Hackett v. Xerox Corp. Long-Term disability Income Plan*, 315 F.3d 771, 774-75 (7th Cir. 2003).  "The obligation under ERISA to review the administrative record in order to determine whether the plan administrator acted arbitrarily and capriciously 'inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues.'" *Evans*, 434 F.3d at 876 (quoting *McDonald*, 347 F.3d at 172).

Finally, "although courts recognize that the interests of the insurance company are generally in conflict with the interests of a claimant, existence of a conflict of interest 'shapes' the application

16

of, but does not change, the arbitrary and capricious standard of review." *Lanier v. Metropolitan Life Ins. Co.*, 692 F. Supp. 2d 775, 786 (E.D. Mich. 2010) (internal citation omitted).  Further, "[m]ere allegations of the existence of a structural conflict of interest are not enough for the court to reject a plan administrator's denial of benefits where there is substantial evidence in the administrative record that supports his or her decision; there must be some evidence that the alleged conflict of interest actually affected the plan administrator's decision to deny benefits." *Id.*  In this case, Plaintiff does not allege any conflict of interest let alone offer any evidence that a conflict of interest actually affected United of Omaha's decision.  Accordingly, the mere possibility of a conflict of interest does not materially alter this Court's application of the arbitrary and capricious standard.  *See Besten v. Delta America Reinsurance Co.*, 202 F.3d 267 (Table), 1999 WL 1336061, at *4 (6th Cir. 1999) ("In this case, [Plaintiff] did not raise the conflict of interest argument in the district court proceedings. As noted above, there is no conflict of interest created under ERISA merely by a fiduciary serving in multiple roles in the benefit determination process.  The district court, therefore, had no reason to consider or to weigh the conflict of interest now alleged in these proceedings."  (internal citation omitted)).

### B. Plaintiff Has Not Demonstrated That Defendant United of Omaha Acted Arbitrarily or Capriciously In Discontinuing Her Short-Term Disability Benefits

With exception to two narrow arguments addressed below, Plaintiff does not make a developed argument that United of Omaha arbitrarily or capriciously evaluated the evidence of record.  And upon a review of the Administrative Record, the Court agrees with Defendant that its decision to terminate short-term disability benefits five months after disability onset was not arbitrary or capricious.  In particular, as summarized at length above, the objective medical evidence – including MRAs, an MRI, and an EEG – indicates that Plaintiff did not suffer a stroke in

17

December 2009.  *See Lanier*, 692 F. Supp. 2d at 788 ("Although the plan requires a claimant to 'provide documented proof of your Disability,' . . . [it] does not specify that the documentation include 'objective evidence.'" . . .  Nevertheless, Sixth Circuit precedent 'suggests that it is entirely reasonable for an insurer to request objective evidence of a claimant's functional capacity.'" (quoting *Rose v. Hartford Fin. Servs. Group, Inc.*, 268 F. App'x 444, 453-454 (6th Cir. 2008))).  Nor did any objective testing explain the cause of Plaintiff's "staring spells."  In May 2010, Dr. Hefzy precluded Plaintiff from driving but she did not conclude that Plaintiff could not return to work.  Further, in September 2010, although admittedly spurred by Plaintiff's financial difficulties, another Henry Ford physician evaluated Plaintiff and then provided her with a return-to-work note.  Dr. LeForce, upon reviewing Plaintiff's complete medical record, also concluded that the medical evidence did not support Plaintiff's claim that she was unable to perform the demands of her job.

As far as Plaintiff's psychological problems, it is true that Dr. Bray's opinion supports Plaintiff's claim that Defendant should have continued short-term disability benefits.  However, mental-status exams performed by other doctors, including Dr. Hefzy in May 2010 and Dr. Leung in September 2010, were largely normal and support the contrary conclusion.  Further, Dr. Silver found that while Plaintiff's emotional liability and ability to deal with work stress were only "fair," her other mental abilities were "good."  Further still, as explained by Dr. LeForce, more than one physician indicated that Plaintiff possibly suffered from a conversion disorder and Dr. Bray's report fails to address this issue.

Plaintiff does not offer a contrary analysis of the record evidence; however, she does advance two specific arguments.  First, Plaintiff asserts that the United States Supreme Court decision in *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003) was wrongly decided, or more

18

generously, that this Court should construe the holding of that case in a peculiar fashion.  (Pl.'s Mot. to Reverse at 13-16.)  Second, Plaintiff asserts that United of Omaha's benefits decision was arbitrary and capricious because it did not consider the Social Security Administration's award of disability benefits.  (*Id.* at 16-17.)  Neither argument is meritorious.

In *Black and Decker*, the United States Supreme Court held that ERISA-governed-plan administrators are "not obliged to accord special deference to the opinions of treating physicians." 538 U.S. at 825.  Plaintiff asserts that "[t]he Supreme Court's ruling that the opinion of a long-term treating physician is to be weighed equally with the opinion of a plan consultant, is over-broad, against public policy and essentially rejects a common sense principle of the Treating Physician Rule."  (Dkt. 10, Pl.'s Mot. to Reverse at 15.)  But even if this were so, this Court is not in a position to deviate from the Supreme Court's holding.  *See Hutto v. Davis*, 454 U.S. 370, 375 (1982) (per curiam) ("[U]nless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be.").[7]  In fact, the law firm that now represents Plaintiff made this very argument in another case decided *prior* to the filing of Plaintiff's brief in this case.  There, District Judge Avern Cohn rejected the argument and stated, "While [Plaintiff] contends *Nord* was wrongly decided, that argument cannot carry the day as it is beyond dispute that the Court is bound by the Supreme Court's decision."  *Martindale v. Lincoln Nat. Life Ins. Co.*, No. 10-15173, 2011 WL 3957607, at *11 (E.D. Mich. Sept. 8, 2011).

Perhaps a fairer version of Plaintiff's argument is that *Black and Decker* does not require this

---

[7]This Court does not intend to suggest that *Black and Decker* was wrongly decided; it is enough that this Court is not in a position to question its clear mandate.

Court to apply a bright-line rule as to Plaintiff's treating physicians but instead allows this Court to consider on a physician-by-physician basis when the treating physician rule should apply.  Plaintiff argues that the Supreme Court "left unclear how the opinions of treating physicians who have provided *long-term care* should be evaluated" and that "*Nord* . . . attempts to prevent abuse of the ERISA system by prohibiting 'routine deference' to physicians that have *not provided long-term care* or who lack the expertise that a plan consultant may have."  (Pl.'s Mot. to Reverse at 14 (emphases added).)  In support of this argument, Plaintiff cites the following language from the Supreme Court's opinion:

> [I]t may be true that treating physicians, as a rule, ha[ve] a greater opportunity to know and observe the patient as an individual . . . . [T]he assumption that the opinions of a treating physician warrant greater credit than the opinions of plan consultants may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration, or when a specialist engaged by the plan has expertise the treating physician lacks.

(Pl.'s Mot. to Reverse at 14-15 (quoting *Black and Decker*, 538 U.S. at 832).)  But the language that Plaintiff relies on comes from a passage where the Supreme Court gave reasons why the creation of a treating-physician rule in ERISA cases is best left to the Legislature or the Secretary of Labor:

> *The question whether a treating physician rule would "increas[e] the accuracy of disability determinations" under ERISA plans, as the Ninth Circuit believed it would, . . . seems to us one the Legislature or superintending administrative agency is best positioned to address.*  As compared to consultants retained by a plan, it may be true that treating physicians, as a rule, "ha[ve] a greater opportunity to know and observe the patient as an individual." . . . Nor do we question the Court of Appeals' concern that physicians repeatedly retained by benefits plans may have an "incentive to make a finding of 'not disabled' in order to save their employers money and to preserve their own consulting arrangements." . . . But the assumption that the opinions of a treating physician warrant greater credit than the opinions of plan consultants may make scant sense when, for example, the relationship between the claimant and the treating

20

> physician has been of short duration, or when a specialist engaged by the plan has expertise the treating physician lacks.   And if a consultant engaged by a plan may have an "incentive" to make a finding of "not disabled," so a treating physician, in a close case, may favor a finding of "disabled."   *Intelligent resolution of the question whether routine deference to the opinion of a claimant's treating physician would yield more accurate disability determinations, it thus appears, might be aided by empirical investigation of the kind courts are ill equipped to conduct.*

538 U.S. at 832 (emphases added).  Given the forgoing, the Court does not find Plaintiff's selective reading of *Black and Decker* persuasive.  *Cf. Paliczuk v. Unum Life Ins. Co.*, No. 09-10794, 2009 WL 3270489, at *6 (E.D. Mich. Oct. 1, 2009) ("Although [Plaintiff] argues that there is some question as to whether a treating physician who has seen a patient for a long period of time is entitled to more weight, there is no authority for such an argument.  *Nord* is the controlling standard.").[8]

Next, Plaintiff argues that United of Omaha erred in failing to consider the Social Security Administration's award of disability benefits.  Here, on April 18, 2011, Defendant informed Plaintiff that she had exhausted her administrative remedies and that no further review of her claim would be conducted.  (AR at 160.)  United of Omaha reiterated this position on May 5, 2011.  (AR at 132.)

---

[8]Moreover, the Court notes that in *Nord* itself, the Ninth Circuit's decision, which was vacated by a unanimous Supreme Court, stated:

> the long-term treating physicians and Black & Decker's independent (but one-time) clinical examiner disagreed. The same clinical materials were available to both.  In such a circumstance, under the treating physician rule, the plan administrator can reject the conclusions of the treating physicians only if the administrator gives specific, legitimate reasons for doing so that are based on substantial evidence in the record.

*Nord v. Black & Decker Disability Plan*, 296 F.3d 823, 831 (9th Cir. 2002) (emphasis added, internal quotation marks omitted).  Because *Nord* itself apparently dealt with "long-term" treating physicians, Plaintiff's reading of *Nord* that invites this Court to draw lines between long- and short-term treating physicians is all the more strained.

Yet Plaintiff did not send Defendant the Social Security Administration's decision until June 3, 2011. (*See* AR at 122, 127.) And even if this Court were to assume that United of Omaha had an affirmative duty to seek out this information, that would have been impossible prior to the close of the administrative record. The Social Security Administration's decision was not even issued until May 17, 2011. (AR at 123.) The Court therefore finds that United of Omaha did not act with caprice in failing to consider what was unavailable. *See Paliczuk v. Unum Life Ins. Co.*, No. 09-10794, 2009 WL 3270489, at *7 (E.D. Mich. Oct. 1, 2009) ("Plaintiff was awarded Social Security benefits after UNUM denied his claim. As such, evidence of his award was not before UNUM nor may [Plaintiff] supplement the administrative record with evidence of his award."); *cf. Wilkins v. Baptist Healthcare Sys.*, 150 F.3d 609, 615 (6th Cir. 1998) (holding that the district court and the court of appeals are limited to reviewing the administrative record as it existed when the plan administrator made its final decision).

In sum, this Court does not intend to minimize Plaintiff's condition nor does the Court preclude the possibility that the medical evidence in this case may have supported a decision extending Plaintiff's short-term disability benefits. But the issue before the Court is whether United of Omaha's contrary decision was arbitrary or capricious. Plaintiff has failed to carry this heavy burden of persuasion.

## III. RECOMMENDED DISPOSITION

For the foregoing reasons, this Court RECOMMENDS that Plaintiff's Motion to Reverse be DENIED and that Defendant's Motion to Affirm be GRANTED.

## IV.  FILING OBJECTIONS TO THIS REPORT

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office.  *See* E.D. Mich. LR 5.1.  A copy of any objections is to be served upon this magistrate judge but this does not constitute filing.  *See* E.D. Mich. LR 72.1(d)(2).  Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).


                                        s/Laurie J. Michelson_____
                                        LAURIE J. MICHELSON
                                        UNITED STATES MAGISTRATE JUDGE
Dated:  February 27, 2012


                            CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on February 27, 2012.


                                        s/Jane Johnson_____
                                        Deputy Clerk